UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIEVE DATA INC., | **VERIFIED COMPLAINT** |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| v. | Case No. _____ |
| SAVANNAH TYNAN, | |
| *Defendant*. | |

Plaintiff Sieve Data Inc. ("Sieve" or the "Company") by its undersigned counsel, states the following as its Complaint against Defendant Savannah Tynan ("Defendant" or Tynan").

## PRELIMINARY STATEMENT

1.      This action arises from Defendant Tynan's abuse of her authority and privileges as Sieve's Chief Technology Officer to steal, unlawfully possess, and misappropriate of *all* of Sieve's confidential information and trade secrets, including the Company's source code, material describing its proprietary human-assisted review process, and other commercially sensitive information.

2.      Sieve is an early-stage technology company specializing in the extraction and transformation of large unstructured and semi-structured datasets into validated and high-quality structured outputs. Sieve's internal AI-powered platform, together with its proprietary human-assisted validation process, is what distinguishes Sieve from its competitors and allows Sieve to achieve what very few data companies, if any, have successfully done — provide customers with bespoke, validated outputs on demand at a scale that would otherwise be highly expensive and time-consuming for the customer to accomplish independently. Sieve's customers include major

hedge funds and similar sophisticated entities in the financial industry throughout the United States.[1] However, Sieve's business and existence is now being threatened by the actions of Defendant.

3.     Tynan was the Company's Chief Technology Officer for four months until her departure from the Company on July 18, 2025. She was tasked with implementing Sieve's information security controls to safeguard the Company's confidential information and trade secrets during the early stages of its operations.

4.     She exploited her position, and upon her departure, stole *all* of Sieve's confidential information and trade secrets. She secretly copied every single file on Sieve's secure cloud storage platform and misappropriated a copy of the Company's source code for its proprietary AI-powered software.

5.     Tynan has no right to this information. By stealing it, she has breached her ironclad Confidential Information and Invention Assignment Agreement with Sieve and violated both state and federal law. Having this information in the wild, and in the hands of someone who has already tried to misappropriate *another* company's confidential information for her benefit, presents an existential threat to Sieve's business.

6.     Sieve's founder, Nicole Lu, discovered Tynan's wrongdoing in October 2025 and immediately demanded that Tynan return all the information she had stolen. Tynan, through counsel, refused. Sieve attempted to work with Tynan in a good faith effort to reach a resolution, but to no avail. Tynan recently went dark and refused to engage further with the Company, which strongly suggests she is misusing or planning to misuse Sieve's confidential information for her own benefit.

---

[1] Sieve is also in advanced discussions with prospective customers internationally.

7.    Sieve will be irreparably harmed if Tynan is not enjoined from disclosing or misappropriating Sieve's confidential information and trade secrets in a competitive enterprise. In addition to a preliminary and permanent injunction, Sieve demands that Tynan return this information and submit to a forensic analysis to confirm that it has been permanently deleted from her devices and has not been shared elsewhere, and for compensatory and punitive damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## PARTIES

8.    Plaintiff Sieve Data Inc. is a corporation organized under Delaware law, with its principal place of business at 200 Vesey Street, 24th Floor, New York, New York. At the time of the events at issue here, Sieve's business address was 169 Madison Avenue, Ste. 15119, New York, New York, and its employees often worked from home or from public workspaces in lower Manhattan.

9.    Defendant Savannah Tynan is a former employee of Sieve who resides in Brooklyn, New York.

10.    Non-party Nicole Lu ("Lu") is the founder and CEO of Sieve. She resides in New York, New York.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

12.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Tynan is a resident of Brooklyn, New York, and a substantial part of the events giving rise to Sieve's claims occurred in Brooklyn.

## FACTUAL BACKGROUND

### A.  Sieve and its Mission

14.     Sieve was founded by Lu in January 2025 to offer a reliable and efficient big-data scraping and cleaning solution for sophisticated customers dealing in highly variable, data-oriented industries. Sieve specializes in extracting, cleaning, and synthesizing large scale variable datasets into refined, validated outputs based on each client's particular needs and specifications. For example, Sieve can ingest content from hundreds of thousands of websites or documents, locate and extract key data identified by Sieve's clients, and then synthesize that information into a clean, consistent dataset (*e.g.,* in a spreadsheet) that clients can use directly for research and modeling processes.

15.     Sieve is the brainchild of Lu, an MIT-educated computer scientist who built her career as business consultant with a focus in data. In that field, she experienced firsthand the challenges of working with and synthesizing largely unstructured big datasets into accurate, readily usable structured information. Lu saw this challenge as a lucrative opportunity. She formulated and developed the technologies, processes, and pricing model that serve as the building block and framework of Sieve's business. She also wrote the code (the "Source Code") that serve as the basis of Sieve's product. Lu formed Sieve thereafter.

16.     While the concept of data cleansing is simple, the process to extract and sanitize highly variable large scale datasets into high-quality, structured outputs is highly complicated, and would generally take weeks, if not months, for Sieve's customers to accomplish. What sets Sieve apart from its competitors is its ability to produce outputs that are accurate enough to be used directly in downstream customer processes, in a fraction of the time it would take the via other avenues.

17.    This commercial advantage is made possible by Sieve's robust automated workflow (the "Workflow"), leveraging a combination of Sieve's proprietary AI-powered platform to extract and cleanse data (the "AI Platform"), and its proprietary human-assisted review process for validating the quality and accuracy of the AI-driven outputs (the "Review Process").

18.    The Source Code operationalizes the Workflow and is the foundation for the AI Platform. It, the Workflow, and the Review Process, are without question Sieve's "secret sauce," of which Sieve derives its economic value through keeping it confidential.

19.    Sieve's customers are primarily hedge funds and other players in the financial services industry throughout the United States (and Sieve is in advanced discussions with potential international customers). The customers do not receive access to Sieve's internal software, tooling, models, workflows, or operational systems used to perform the processing and validation. They do not see the Source Code, the Review Process, or the Workflow. Sieve provides only the final output (*e.g.*, the spreadsheet or similar set of files) to its customers.

**B.    Tynan joins Sieve as CTO**

20.    Lu met Tynan approximately a month after Sieve's incorporation, By this time, Sieve already had a protype product and had applied to the startup accelerator, Y Combinator.

21.    Tynan expressed interest in working together with Lu and they underwent a "co-founder trial" period. Soon thereafter, Tynan joined Sieve as a co-founder and was appointed to its board in March 2025.

22.    Tynan was brought on to Sieve in part because of her technical background and experience in management consulting. Tynan is also MIT graduate with a master's degree in Computer Science, and she previously worked at Bain & Company in its private equity group.

Like Lu, she has experience dealing with the challenges of working with largely unstructured big datasets.

23.     Lu was the Company's CEO and Tynan was its CTO. Tynan was responsible for implementing Sieve's information security controls and protocols, and was also involved in coding and product development. At the time Tynan joined, Sieve was still in the early stages of setting up its operations and infrastructure.

24.     Tynan was also involved in the process of interviewing, engaging, and overseeing the work of the Company's data review team in accordance with the process and procedures (including the Review Process) developed by Lu.

25.     Neither Lu nor Tynan was an employee, and neither drew a salary, until after Sieve received an investment from Y Combinator in mid-April 2025. Upon Tynan's suggestion, Tynan was paid an annual base salary of $150,000 on a pro-rated basis. Y Combinator also assigned an experienced mentor to guide the Company as it grew.

26.     Pursuant to stock purchase agreements executed on or around March 26, 2025, Lu was granted 51% of the Company's equity and Tynan was granted 49%. Tynan's grant vested in tranches over 4 years, with the first tranche scheduled to vest (assuming she was still with the Company at the time) on March 26, 2026. If Tynan left the Company before then (which she did), Sieve had the option to repurchase all of her unvested shares for the sum of $39.20 (which it did).

**C.  Tynan's Contractual Confidentiality Obligations**

27.     In her role as CTO, Tynan was given access to all of Sieve's confidential information and trade secrets, including its business plans, vendor and client contracts, pricing model, sales leads, source code, model evaluations, workflow procedures, human reviewer hiring and training materials, and other competitively sensitive materials.

28.     Accordingly, on April 4, 2025, Tynan signed a Confidential Information and Invention Assignment Agreement (the "Agreement") (**Exhibit A**).[2]

29.     The purpose of the Agreement is to safeguard and protect the Company's "Confidential Information," which it defined as any "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties", including:

- "technical data, trade secrets, . . . product or service ideas or plans, software codes and designs",
- "agreements with third parties, lists of, or information relating to, employees and consultants of the Company…or suppliers and [prospective and actual] customers",
- "price lists, pricing methodologies, cost data, market share data, marketing plans…contract information, business plans…budgets or other business information".

Agreement, at §2(b). The Agreement is also necessary to preserve the goodwill of the Company's clients who entrusted Sieve with their sensitive information.

30.     Tynan further acknowledged that she would be provided with, and have access to Company Confidential Information "without which [she] would not be able to perform [her] duties to the Company" and accordingly agreed to "at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform [her] obligations to the Company . . .and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that [she] obtain[s], access[es] or create[s]" in connection with her work for Sieve." *See* Agreement, §2(a).

---

[2] All exhibits referenced herein refer to the exhibits to the Declaration of Nicole Lu, dated March 13, 2025, filed herewith.

31.     The Agreement also made clear that Tynan's obligations to safeguard and not misuse the Company's Confidential Information survived even if she left Sieve. Tynan agreed that upon the termination of her "Relationship" with the Company, she would:

> . . . deliver to the Company (and will not keep in [her] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [her] pursuant to the Relationship or otherwise belonging to the Company….

*Id.* at §4.

32.     The Agreement further required, and Tynan further agreed, that upon her departure from Sieve, she would sign and deliver a "Termination Certification" (in a form attached as Exhibit C to the Agreement) in which she certifies that she, among other things:

- "do[es] not have in [her] possession, nor have [] failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Sieve";

- "[has] complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement"; and

- "will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees."

*Id.* at §5 and Exhibit C thereto. Further, Tynan agreed to "execute promptly…after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of [the Agreement], upon the Company's written request to do so." *Id.* at §9(a).[3]

33.    Lu had already executed an identical Confidential Information and Invention Assignment Agreement. In addition, Sieve requires all its employees and contractors to sign intellectual property and non-disclosure agreements governing their access, usage, and treatment of Sieve's confidential information and trade secrets.

**D. Company Policies and Practices Governing the Treatment of Sieve's Confidential Information and Trade Secrets**

34.    As part of her role as Sieve's CTO, Tynan was responsible for implementing Sieve's data security and privacy practices to secure Sieve's confidential information and trade secrets.

35.    Among other things, Tynan was tasked with securing Sieve's System and Organization Controls 2 (SOC2) Types I and II certifications to ensure that Sieve's data security and privacy controls are consistent with industry best practices. To that end, Tynan drafted the initial version of Company's Employee Code of Conduct (the "Code of Conduct") in or around June 2025 – about a month before Tynan's departure. The Code of Conduct intended to further lay out the confidentiality obligations of the Company's employees and contractors.

---

[3] As part of the Agreement, Tynan also represented that she had not made, and there are no inventions belonging to her "that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development" and that to the extent she have failed to identify such inventions at the time of signing the Agreement, she "forever waive any and all rights or claims of ownership to such Inventions." Agreement, at §3(a) Tynan further agreed to assign to Sieve all [her] right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein." *Id.* at §3(d). She therefore has no basis to claim, if she attempts to do so, that she has any ownership interest in any of the information she misappropriated from Sieve.

36.    The Code of Conduct, intended to be distributed to all Company employees and contractors, contains clear language describing the requirement of confidentiality in the Company's work and making it clear that employees are not allowed to transfer or save Company data, documents, work, or other information to personal devices. The Code of Conduct further obligates employees and contractors not to reveal details of the Company's clients and business operations to outside entities without approval.

37.    Tynan departed the Company before she was able to complete Sieve's SOC2 certifications and the Code of Conduct. Since then, Sieve has obtained its SOC2 certifications, finalized a Code of Conduct, and implemented other security and privacy controls. Sieve has also since promulgated an Employee Handbook containing a confidentiality policy that it provides to every employee and contractor working for the Company. Sieve also had mandatory device encryption, which was implemented by Tynan as CTO.

**E.  Sieve's Confidential Information and Trade Secrets**

38.    Sieve's confidential information and trade secrets are stored on Sieve's enterprise Google Workspace system and a private GitHub repository. Both systems are password-protected and require an authorized account to access. All accounts to access the systems are secured via two-factor authentication and all of Sieve's Google Workspace-enabled accounts are connected to the central employee management platform in the Google Workspace system.

39.    The Source Code was stored in the private GitHub repository. At times, Tynan and Lu maintained copies of the Source Code on their individual computers as necessary to update and further develop the code.

40.    The Google Workspace system held Sieve's Google Drive, Gmail, and Google Calendar. Sieve's business plans, model evaluations, vendor and client contracts, pricing model,

sales leads, workflow procedures, client data, reviewer hiring and training materials, and other commercially sensitive information are stored on the Company's Google Drive.

41.    Sieve's trade secrets include, but are not limited to: (a) its Source Code and model evaluations; (b) the Review Process and related reviewer hiring and training materials, (c) its customer lists and sales leads, and (d) its pricing model.

### Sieve's Source Code and Model Evaluations

42.    As discussed above, Sieve's "secret sauce" comprises two components: its Source Code and human-assisted Review Process.  Sieve invested significant time and resources in the development of each of these components, and derives its economic value from each through maintaining their secrecy. Access by competitors to this information would give them the ability to replicate Sieve's product, effectively disrupting Sieve's business.

43.    The Source Code is the core logic of Sieve's Workflow and everything Sieve's product does. This includes the AI extraction process including specialized prompts and strategies to guide the AI models to perform accurately and reliably, how the Company orchestrates and assigns human reviewers to review the outputs of the AI extraction, how the Company correctly determines the correct data value based upon the reviewers' inputs, the proprietary tooling for the reviewers to conduct their review work efficiently and accurately, and how the Company stores the data and serves it to the clients. The code is the product of over a thousand of hours of development and research work by Sieve (principally by Lu), and has undergone improvements based on Sieve's learnings through the course of its business.

44.    Sieve rigorously tests the efficiency and precision of its Source Code, Workflow, and processes through a series of model evaluations to optimize its product, and to stay competitive

in the industry. Sieve's model evaluation data and documents were stored on Sieve's Google Drive during Tynan's tenure at Sieve.

45.     Model evaluations are critical to AI companies, like Sieve, because they are the main method by which these companies evaluate and improve their products. For example, Sieve's model evaluations are deployed to test the accuracy of the Company's product against the types of workflows and sources that are representative of those it sees from customers, and identify pain points or capabilities to prioritize for improvement. Accordingly, these model evaluations are tailored specifically to Sieve's product and contain information regarding the key performance factors and metrics that are proprietary and relevant to the product, as well as information reflecting Sieve's strategies and its learnings from its customers. This information is highly proprietary and valuable because it would otherwise allow a competitor to distill Sieve's learnings and fine-tune their product to compete with Sieve's in the open market.

**Sieve's Review Process and Related Hiring and Training Materials**

46.     Also central to Sieve's product is Sieve's proprietary Review Process, which leverages a dedicated team of human reviewers to validate the accuracy of the outputs. The Review Process includes Sieve's processes on how it recruits data reviewers using dedicated channels and signals/data points developed by Sieve; how it evaluates and trains the data reviewers; how reviewers are deployed to validate the data; how the Company discovers and corrects errors in AI or human output; and how performance of AI and human reviewers is measured.

47.     The Review Process was formulated and developed by Sieve through rigorous research and trial-and-error. Reviewers are carefully selected, evaluated, and hired through a dedicated screening process developed by Sieve, which includes a series of interviews and assessment tests reviewers are required to undergo. The interviews, testing, and training were

improved over time to adjust to Sieve's and its customers' needs because of Sieve's learnings. The process in which reviewers are hired and trained is highly proprietary and deeply guarded at Sieve; after all, no matter how much data Sieve is able to extract and clean, the output is not valuable if it is not accurate.

### Sieve's customer lists and sales leads

48.    Sieve's customer lists, sales leads, and pricing model are critical to the Company. As a nascent start-up, every relationship and lead is valuable.

49.    Sieve's customer lists and sales leads are curated through Lu's personal and professional contacts, and Sieve's marketing efforts and participation at various industry conferences. The scoping and building of these relationships required time and effort by Sieve. Among other things, Sieve kept a "Networking event tracker" and a "Sav/Nicole outreach tracker" documenting upcoming events and Sieve's outreach with prospective customers.  Similarly, Sieve's maintains profiles and proposal for all its customers and sales leads on the Google Drive in a folder titled "Demo data."

50.    The disclosure and misappropriation of these contacts would impair Sieve's goodwill and its relationship with its customers. Furthermore, competitors can use this information to solicit and divert business and other opportunities away from Sieve and towards them, or to build their competing product.

51.    To further underscore the sensitivity of this customer and lead information, Sieve's customers sign mutual non-disclosure agreements, which include the obligation not to disclose Sieve's relationship with the customer. Sieve's reviewers and engineers are not even given the names of the customers for which they are completing work, unless the information is essential to the project.

**Sieve's Pricing Model**

52.     Sieve's pricing model sets forth the pricing structure of Sieve's product and services and Sieve's negotiated vendor/contractor pricing and rates. The pricing model was developed using non-public information Sieve collected from its contractors, customers, and partners, including Y Combinator, and other non-public information derived from Sieve's product strategy, performance metrics, and overhead costs. None of the information from which Sieve's pricing model is derived is readily known in the industry as Sieve's business is niche and Sieve employs an innovative Workflow process that no other company in the industry has. Furthermore, Sieve does not disclose to customers the details and underlying strategy of how it prices its product and services. Instead, customers are only provided high-level level information how they will be charged for the product and services (*e.g.,* based on data volume). Sieve's pricing model is saved on the Company's Google Drive as "Copy of Basic cost model" and "Pricing Model." Sieve's pricing practices would be valuable to a competitor to set prices which meet or undercut Sieve's.

**F.  Restricted Access to Sieve's Confidential Information and Trade Secrets**

53.     Sieve's employees and contractors are only provided information on a need-to-know basis, and as a result, do not have access to most of the information, documents, and data within the Company. Lu and Tynan (who were each bound by an Agreement) were the only Sieve personnel who had full access to the Company's confidential information and trade secrets.

54.     Contractors and employees are required to work on Sieve projects exclusively within the Company's systems. They are bound by confidentiality agreements in which they agree not to store or retain any Company documents, data, work, or other information on their personal devices or to misuse or misappropriate the information they are provided.

55.     Once an employee or contractor's Company email is deactivated, they no longer have access to Company systems.

## G. Tynan Stops Working and Steals All of the Company's Confidential Information Before Her Departure from Sieve

56.     Tynan's tenure with Sieve was short-lived. Owing to a variety of factors, in or about late June or early July 2025, Tynan and Lu agreed to part ways. During their discussions leading up to Tynan's departure, Tynan expressed to Lu and their Y Combinator mentor that she still wishes to be a founder and intends to raise another venture in the future.

57.     Based upon Sieve's records, Tynan substantively stopped performing services for Sieve as early as mid-June, and her last commitment of code to the Company's GitHub repository was June 18, 2025. On or around June 26th, Tynan told Lu that she could not be motivated to work on an endeavor that she may not be part of for much longer.

58.     Tynan nevertheless was paid until her last day at the Company.

59.     On July 12, 2025, Lu emailed Tynan regarding the proposed terms of Tynan's separation. Tynan did not respond. Lu subsequently emailed Tynan on July 16th confirming that Tynan's last day would be July 18, 2025.

60.     On July 18th, Sieve terminated Tynan's access to its systems.

61.     On the same day, Tynan, through counsel, made a demand on Sieve for unpaid compensation, claiming that Tynan is at least "entitled to payment of minimum wages at $16.50 per hour," among other things. Sieve responded through counsel on July 29th disputing Tynan's claims and, since Tynan had refused to return Sieve's information or certify that she had none of the Company's Confidential Information, demanding that she return, among other things (i) login and user credentials for the Company's customer relationship tools; (ii) logins for the Company's

website and domain registry account; (iii) customer contracts; (iv) fundraising documents; and (iv) any copies of the Source Code she held.

62.     While the parties continued to negotiate these issues through counsel, Lu became increasingly suspicious that Tynan had done more than just decline to return information on her laptop. She recalled that in April 2025, Tynan tried to convince an employee of one of Sieve's competitors to mine that company's customer-relationship management system for potential customers, resign, and then provide that information to Sieve. Lu strongly objected to this plan, but Tynan did not relent until Sieve's Y Combinator mentor stepped in, telling Tynan directly: "Do not have her search through her current company database to give you leads[.] Highly illegal and unethical[.]"

### Tynan's Google Takeout and Download of Sieve's Confidential Information

63.     In October 2025, Sieve caused former counsel to hire BlueStar, a third-party forensic consultant, to audit Tynan's use of Sieve's technology in the days before her July 18th departure. The audit revealed that on July 14th, after Tynan and Lu had decided to part ways (and Lu's July 12th email) and just days before her departure on July 18, Tynan initiated multiple "Google Takeout" requests for Sieve's information. *See* **Exhibit B** (Google Takeout audit log).

64.     Google Takeout is a bulk data transfer service that allows a user to copy some or all of the files saved in a Google "cloud" to which they have access, package those copied files into a readily transferrable archive, and download that archive onto another device. Google Takeout is not a function used during Sieve's normal course of business, and no user other than Tynan had ever initiated a "Takeout" of Sieve's information.

65.     The forensic audit revealed that Tynan requested a full "Takeout" of Sieve's Google Drive, Gmail, and Google Calendar, and her Sieve Google Account data, from an Internet

Protocol (IP) address based in Brooklyn. An IP address is a unique numerical identifier assigned to each device connected to the internet. This IP address was consistent with Tynan's home address and the IP addresses logged from the prior times Tynan accessed Sieve's Google Workspace using her Sieve account. Tynan then downloaded each "Takeout" archive on July 17th from the same IP address.

66.     In her role as CTO, Tynan had near-unfettered access to Sieve's Google Workspace. This includes all of Sieve's Google Drive, Gmail, and Google Calendar, and the information contained within those tools and platforms discussed in paragraphs 38-52 above. Tynan abused her authority to download virtually all of Sieve's information on the Google Workspace.

### Tynan's "Syncing" and Sending of Sieve's Information to Her Personal Devices and Accounts

67.     The forensic audit also showed that Tynan effectively stopped performing work around June 30, 2025. Most, if not all, of the activity thereafter was of Tynan copying, downloading, and syncing Sieve's data up until her departure:

- In addition to the Google Takeouts, Tynan "synced" her laptop and several personal devices to Sieve's systems to ensure that she had the most up-to-date versions of Sieve's confidential files. *See* **Exhibit C (**Google Sync report).

  The Google Sync report reveals that Tynan "synced" at least three personal devices to Sieve's systems between July 17th and 18th. Each of the devices bear a unique serial number and "Device ID" captured in the report. Upon information and belief, all three of those devices are Apple devices, including an iPhone and MacBook laptop.

- BlueStar's Google Drive audit log showed Tynan also "synced" certain of Sieve's information to her personal email address at least forty-one (41) times since June 26th; these synced files include but are not limited to:

  (a) Sieve's pricing model on the day Tynan had informed Lu that she could not be motivated to work;

      (b) Sieve's model evaluations (titled "150602 model evals.xlsx"), which is the main method by which Sieve evaluates and improves its product;

      (c) information relating to Sieve's customers and sales leads, including call notes from Sieve's sales calls with actual and/or prospective customers, and Sieve's outreach tracker;

      (d) information relating to Sieve's Review Process, including Sieve's reviewer assessment documents.

68.    In additional to a wholesale download of Sieve's data, Tynan targeted confidential information and trades secrets that would enable her or a competitor to replicate Sieve's product. In particular, the information Tynan targeted suggests that she intends to disseminate or otherwise misuse Sieve's learnings from its conversations with customers, disseminate or replicate Sieve's reviewer screening and assessment process; disseminate or replicate Sieve' Workflow and AI Platform through the stolen model evaluations; and disseminate or replicate Sieve's technical documents regarding Sieve's products.

69.    Even more brazenly, and in a manner establishing her willful and malicious intent, Tynan shared certain documents from Sieve's Google Drive to her personal email account at some time prior to her departure to, on information and belief, circumvent Sieve's termination of her access to the Company's systems. This allowed her to retain access to those documents through the shared directory Tynan had created within Sieve's Google Workspace for the Company. On July 20th – two days after her departure and after her Company access was revoked – Tynan synced Sieve's reviewer assessment document to her personal email account. Sieve had removed Tynan's personal email account before the BlueStar forensic audit.

70.    Given that Tynan conducted these Takeouts and synced these devices after she had already agreed to leave Sieve, there is no argument that she needed access to the data for Company business. She did not.

71.     Further, one of the only copies of Sieve's highly confidential computer Source Code for its AI Platform—part of the "secret sauce" that defines its business and underpins its product offerings to its customers—was maintained on Tynan's laptop. Tynan has refused to return or to confirm that she has deleted her copy of the Source Code.

72.     Tynan contended that she needed *all* of this information in light of her potential compensation claims against the Company. This is simply not credible. She would not need the Company's software Source Code, Review Process, Workflow, customer lists, model evaluations, strategic plans, customer call notes, staffing protocols, and development notes in connection with a simple compensation claim.

73.     Tynan has plainly misappropriated this information to use as leverage against Sieve and to potentially launch a competitor using Sieve's own confidential information against it.

**H.  Tynan refuses to return Sieve's Confidential Information and Trade Secrets.**

74.     Sieve continued to attempt to work with Tynan on a protocol to ensure that its Confidential Information was returned and completely deleted from Tynan's devices.

75.     On December 4, 2025, Tynan's counsel rejected Sieve's then-most recent proposal, but indicated there was still room to make a deal. On February 22, 2026, Sieve made a last-ditch effort to engage with Tynan and reiterated its demand that Tynan completely delete all of Sieve's confidential information and trade secrets on Tynan's devices and accounts, and that she undergo a forensic analysis to confirm she has deleted and no longer possesses Sieve's data. **Exhibit E.**

76.     Tynan refused to respond, further demonstrating that she intends to misappropriate Sieve's information for commercial gain. She continues to possess all of the Company's confidential information and trade secrets.

## CAUSES OF ACTION

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS
### (Defend Trade Secrets Act - 18 U.S.C. § 1836 *et seq.*)

77.     Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

78.     The Defend Trade Secrets Act ("DTSA") defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible . . . (A) if the owner took reasonable measures to keep such information secret; and (B) the information derives independent economic value …from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

79.     Under 18 U.S.C. § 1836(b), an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

80.     A trade secret is misappropriated where an individual knowingly:

(1) "steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;"

(2) "without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;"

(3) "receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;" or

(4) attempts to commit any of the above.

81.    The trade secrets at issue are Sieve's: (a) Source Code and model evaluations; (b) human-assisted Review Process and related reviewer hiring and training materials, (c) customer lists and sales leads, and (d) pricing model (together, the "Trade Secrets").

82.    Sieve is the owner of these trade secrets under 18 U.S.C. § 1839(4) because it has rightful legal or equitable title to, or license in, the trade secrets, including its data and files.

83.    Sieve has taken reasonable measures to keep the information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

84.    Under 18 U.S.C. § 1839(5)(A), Tynan misappropriated Sieve's Trade Secrets by abusing her privileges as the Company's CTO to secretly download, without authorization, copies of the information, and by her continued retention of the information.

85.    Tynan's misappropriation was willful and malicious. This is evident from Tynan's willful disregard of her contractual obligations to Sieve and the very policies she herself drafted.

86.    Sieve's Trade Secrets are related to products used in, or intended for use in, interstate or foreign commerce given Sieve's national (and potentially international) customer base.

87.    Based on these violations, pursuant to 18 U.S.C. § 1836, Sieve is entitled to (i) seizure of property necessary to prevent the propagation or dissemination of Sieve's trade secrets, (ii)  an order compelling a forensic inspection of Tynan's electronic devices and storage accounts to ensure that the information has not been otherwise retained and/or disseminated; (iii) an order compelling the deletion of all copies of Plaintiff's confidential information and trade secrets from Defendant's electronic devices and storage accounts; (iv)  an injunction to prevent further

misappropriation, (v) an award of damages, (vi) an award of exemplary damages, and (vii) an

award of attorneys' fees.

## COUNT II
## BREACH OF CONTRACT
### (California Law)

88.    Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the

preceding paragraphs of this Complaint.

89.    On or around April 4, 2025, Tynan entered into the Agreement, in which she agreed

to, at all times during her relationship with Sieve and thereafter, not disclose, and not use, except

for the benefit of the Company to the extent necessary to perform her obligations to the Company,

any of Sieve's confidential Information that she obtained, accessed or created during the term of

the relationship. *See* Agreement, §2(a).

90.    Tynan further agreed, upon her departure from Sieve, to return, and not keep or

create, any information, data and materials belonging to Sieve, and certify the same by sending

back a "Termination Certification" in the form attached as Exhibit B to the Agreement.

91.    The Agreement also contains a California choice-of-law clause stating that:

> The validity, interpretation, construction and performance of this
> Agreement, and all acts and transactions pursuant hereto and the
> rights and obligations of the parties hereto shall be governed,
> construed and interpreted in accordance with the laws of State of
> California without giving effect to the principles of conflict of laws.

92.    Despite the express obligations, and in breach of the Agreement, Tynan, secretly

and without authorization, downloaded, copied, and took with her, all of Sieve's confidential

information and trade secrets immediately before her departure from Sieve.

93.    Tynan refused to return, and continues to possess Sieve's confidential information

and trade secrets. Tynan's continued possession of, and refusal to return, Sieve's information is

unsanctioned, and suggests that she may be planning launch a competitor using Sieve's own confidential information against it.

94.     As a result of Tynan's breaches and threatened continued breaches, Sieve has been irreparably injured, and continues to face irreparable injury. Sieve is threatened with loss of goodwill, damage to its reputation, and diminishment of its business and competitive advantages in the industry.

95.     Given the volume of information and materials at issue, and Tynan's surreptitious and bad-faith conduct, mere assurances that she will or has deleted stolen information are wholly insufficient.  A forensic analysis of Tynan's personal electronic devices is essential to ensure that none of Sieve's confidential information and trade secrets remains in her possession, or is misused or further disseminated by Tynan.

96.     As a result of the foregoing, Sieve seeks damages, injunctive relief, and any other remedies necessary to prevent further misuse of Sieve's confidential information and trade secrets.

<u>**COUNT III**</u>
**MISAPPROPRIATION OF TRADE SECRETS**
**(New York Law / California Law (Cal. Civil Code §§ 3426 *et seq.*))**

97.     Plaintiff repeats and realleges, as if set forth fully herein, the allegations in the preceding paragraphs of this Complaint.

98.     Sieve owns and possesses its Trade Secrets and confidential information.

99.     Sieve has taken reasonable measures to keep this information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

100.    Tynan was provided access to Sieve's confidential information and trade secrets as its CTO and to permit her to perform her responsibilities to Sieve.

101.    Tynan was obligated to maintain the confidentiality of the information she received from Sieve and was not permitted to improperly disclose, copy, or otherwise use this information either for her own benefit or for the benefit of others. While the Agreement Tynan executed contains a California choice-of-law provision, the New York state law also applies. The parties are based in New York and the conduct at issue occurred in New York.

102.    Tynan exploited her authority and access as Sieve's CTO to misappropriate Sieve's confidential information and Trade Secrets: she secretly, and without authorization, downloaded, copied, and took with her, all of Sieve's confidential information and Trade Secrets immediately before her departure from Sieve. Tynan refused to return, and continues to unlawfully possess, Sieve's confidential information and Trade Secrets.

103.    Tynan's misappropriation was willful and malicious. This is evident from Tynan's willful disregard of her contractual obligations to Sieve and the very policies she herself drafted; the fact that she downloaded *all* of this information after being told when her last day at Sieve would be but before her computer access was shut off; her refusal to certify deletion; and her termination of discussions regarding a potential resolution.

104.    Based on these violations, Sieve is entitled to (i) seizure of property necessary to prevent the propagation or dissemination of Sieve's trade secrets, (ii) an order compelling a forensic inspection of Tynan's electronic devices and storage accounts to ensure that the information has not been otherwise retained and/or disseminated; (iii) an order compelling the deletion of all copies of Plaintiff's confidential information and Trade Secrets from Defendant's

electronic devices and storage accounts; (iv) an injunction to prevent further misappropriation; (v) an award of damages; (vi) an award of exemplary damages; and (vii) an award of attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant as follows:

1. Injunctive relief against Defendants, including a preliminary injunction and permanent injunction prohibiting Defendant from possessing, using, disseminating, or selling any interests in Sieve's confidential information and trade secrets or in any way causing further damage to Sieve with respect to these information and trade secrets;

2. An order for a forensic inspection of Defendant's electronic devices and storage accounts and to ensure that Plaintiff's confidential information and trade secrets have not been otherwise retained and/or disseminated;

3. An order for the deletion of all copies of Plaintiff's confidential information and trade secrets from Defendant's electronic devices and storage accounts;

4. An award of monetary damages in an amount to be determined at trial;

5. Restitution or disgorgement of profits earned as a result of any unjust enrichment;

6. An award of exemplary damages;

7. An award of attorneys' fees, and costs and expenses; and

8. Any other relief that the Court deems just and proper.

DATED:        March 13, 2026
              New York, NY

                              Respectfully submitted:


                                  ___*/s/ Joseph Gallagher*___
                              Jonathan Harris
                              Joseph Gallagher

Marilyn Yuan
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
T: (212) 397-3370
E: jon@hs-law.com
E: jgallagher@hs-law.com
E: myuan@hs-law.com

*Attorneys for Plaintiff Sieve Data Inc.*

## **VERIFICATION**

I, Nicole Lu, declare as follows:

1) I am the Chief Executive Officer of Plaintiff Sieve Data Inc. I am authorized to make this verification on Plaintiff's behalf. I have read the Verified Complaint in the above-captioned action and am familiar with its contents.

2) The facts stated therein are true and correct to my own knowledge except as to matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2026 in New York, NY.

_____
Nicole Lu