UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SIEVE DATA INC.,

                    *Plaintiff*,

      v.

SAVANNAH TYNAN,

                    *Defendant*.

**PLAINTIFF SIEVE DATA INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>APPLICATION FOR A PRELIMINARY INJUNCTION</u>**

HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
T. (212) 397-3370
F. (212) 202-6206

*Attorneys for Plaintiff Sieve Data Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................... 1

FACTUAL BACKGROUND .................................................... 1

    Lu Founds Sieve and Develops its Confidential Trade Secrets ............................ 2

    Tynan Joins Sieve as its CTO ................................................. 3

    Sieve Implements Strict Information Security Protocols ........................ 4

    Tynan Leaves Sieve and Steals All of its Data ........................ 6

    Sieve's Audit Reveals the True Scope of Tynan's Wrongdoing ........................ 7

    Sieve Attempts a Resolution, But Tynan Rejects It ........................ 9

ARGUMENT .................................................... 9

  **I.**  Sieve Would Suffer Irreparable Harm Absent a Preliminary Injunction. .............. 10

  **II.**  Sieve Is Likely to Succeed on the Merits. ................................. 12

    A.  Tynan Violated the DTSA ........................................ 13

    Sieve's Confidential Information Constitutes Trade Secrets ........................ 13

    Tynan Misappropriated Trade Secrets ................................ 15

    B.  Tynan Breached the Agreement ........................................ 16

    C.  Tynan Violated State Law Prohibiting Misappropriation of Trade Secrets ........................................ 17

  **III.**  A Preliminary Injunction is in the Public Interest ........................ 18

  **IV.**  The Court Should Waive Any Obligation to Post a Bond ........................ 18

CONCLUSION .................................................... 19

i

# TABLE OF AUTHORITIES

## CASES

*199 Delaware Ave., Inc. v. Lake Effect Artisan Ice Cream*,
  2019 WL 1723588 (W.D.N.Y. Apr. 18, 2019) ........................................................ 12

*725 Eatery Corp. v. City of N.Y.*,
  408 F.Supp.3d 424 (S.D.N.Y. 2019) ...................................................................... 12

*A.H. by and through Hester v. French*,
  985 F.3d 165 (2d Cir. 2021) .................................................................................. 10

*Alta Devices, Inc. v. LG Electronics, Inc.*,
  343 F.Supp.3d 868 (N.D. Cal. 2018) ..................................................................... 17

*BaseCap Analytics Inc. v. Amenn*,
  2023 WL 8113524 (S.D.N.Y. Nov. 22, 2023) ........................................................ 18

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  666 F.Supp.3d 328 (S.D.N.Y. 2023) ...................................................................... 13

*Conn. State Police Union v. Rovella*,
  36 F.4th 54 (2d Cir. 2022) ..................................................................................... 10

*DermSource, Inc. v. CityMedrix, LLC, et al.*,
  2023 WL 265905 (E.D.N.Y. Jan. 18, 2023) ............................................................. 9

*Devos, Ltd. v. Record*,
  2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) ........................................................ 11

*DeWitt Stern Grp. Inc. v. Eisenberg*,
  2013 WL 2420835 (S.D.N.Y. June 4, 2013) .......................................................... 11

*Eng v. Smith*,
  849 F.2d 80 (2d Cir. 1988) ..................................................................................... 12

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009) ................................................................................... 10

*HomeIt, Inc. v. Wen*,
  2020 WL 353098 (E.D.N.Y. Jan. 21, 2020) ........................................................... 12

*IDG USA, LLC v. Schupp*,
  416 F. App'x 86 (2d Cir. 2011) .............................................................................. 10

*IME Watchdog, Inc. v. Gelardi, et al.*,
  2022 WL 1525486 (E.D.N.Y. May 13, 2022) .................................................... 9, 10, 18, 19

*In re Dana Corp.*,
  574 F.3d 129 (2d Cir. 2009)..................................................................................... 14

*Intertek Testing Svcs., N.A., Inc. v. Pennisi*,
  443 F.Supp.3d 303 (E.D.N.Y. 2020) ........................................................................ 10

*Marks Org., Inc. v. Joles*,
  784 F.Supp.2d 322 (S.D.N.Y. 2011)......................................................................... 12

*Nature's Bounty, Inc. v. SuperX Drugs Corp.*,
  490 F.Supp. 50 (E.D.N.Y. 1980) .............................................................................. 12

*Oasis West Realty, LLC v. Goldman*,
  250 P.3d 1115 (Cal. 2011) ....................................................................................... 16

*PleasrDAO v. Shkreli*,
  804 F.Supp.3d 362 (E.D.N.Y. 2025) ........................................................................ 9, 17

*Rodney v. United Masters*,
  2023 WL 2184865 (E.D.N.Y. Feb 10, 2023)............................................................ 14

*Rokt Corp. v. AdsPostX, Inc.*,
  2025 WL 2711190 (S.D.N.Y. Sept. 23, 2025)........................................................... 14

*Space Data Corp. v. X*,
  2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) .......................................................... 17

**STATUTES**

18 U.S.C. § 1836(b)(1) .................................................................................................. 13

18 U.S.C. § 1839(3) ....................................................................................................... 13

18 U.S.C. § 1839(5) ....................................................................................................... 15

18 U.S.C. § 1839(6) ....................................................................................................... 15

Cal. Civ. Code §§ 3426.................................................................................................. 17

**OTHER AUTHORITIES**

FRCP 65(c) .................................................................................................................... 18

Plaintiff Sieve Data Inc. ("Sieve" or the "Company") submits this memorandum of law in support of its application for preliminary relief under Federal Rule of Civil Procedure ("FRCP") 65 against Defendant Savannah Tynan ("Tynan").

## PRELIMINARY STATEMENT

Defendant Savannah Tynan was the Chief Technology Officer of Sieve, an early-stage startup, for four months in 2025. After she and Sieve co-founder Nicole Lu agreed to part ways, Tynan exploited her CTO-level access to Sieve's computer systems to misappropriate ___all___ of Sieve's confidential business information, including the source code to its proprietary software and other commercially-sensitive trade secrets. When the Company uncovered her theft in October 2025, it immediately demanded that Tynan return the data and confirm its deletion. Tynan refused to do so, and the Company's subsequent attempts to negotiate a solution came to naught.

Tynan has violated the federal Defend Trade Secrets Act (the "DTSA"), her contractual obligations of confidentiality, and New York and California law. Accordingly, Sieve seeks a preliminary injunction (i) compelling Tynan to return and delete the information she stole from the Company; (ii) enjoining further retention or distribution of the stolen information; and (iii) requiring a forensic analysis, at Tynan's expense, of her personal electronic devices to confirm whether she has provided the stolen information to anyone else or improperly retained copies of the information.

## FACTUAL BACKGROUND

The following facts are drawn from the Declaration of Nicole Lu (the "Lu Decl.") and its exhibits, submitted herewith.

1

*Lu Founds Sieve and Develops its Confidential Trade Secrets*

Lu, an MIT-educated computer scientist with a background in business consulting, founded Sieve in January 2025. Lu Decl. ¶ 6. Sieve's business is extracting, cleaning, and synthesizing large-scale variable datasets into validated outputs in a format designated by the client. For example, Sieve can ingest content from thousands of websites, locate and extract key data from each website, and organize that key data into a form the client can easily review, like a spreadsheet. *Id.* ¶ 5. Most of Sieve's clients are in the financial services industry, and they use Sieve's output in their own (often confidential) research and modeling exercises. *Id.* ¶ 11. While the customers could often review, extract, and organize these datasets themselves, Sieve can do so in a fraction of the time and via processes that ensure the information is accurate. *Id.* ¶ 7.

Sieve is able to deliver this value to its customers by using a robust workflow (the "Workflow"), which includes a proprietary AI-powered platform (the "AI Platform") used to extract and cleanse data, as well as a proprietary human-assisted review process for validating the quality and accuracy of the AI outputs (the "Review Process"). *Id.* ¶ 8. Lu wrote the source code (the "Source Code") to automate the Workflow and support the AI Platform. It governs the AI models' data identification and extraction process, how human reviewers are assigned, the proprietary tooling used by reviewers, how the reviewer inputs are implemented, and how the Company stores data and sends it to clients. *Id.* ¶ 33. The Source Code is the product of over a thousand hours of development and research by Sieve, principally by Lu. *Id.*

The Review Process, in turn, was formulated and developed by Sieve through rigorous research and much trial-and-error. *Id.* ¶ 37. It encompasses Sieve's process for recruiting, evaluating, and training human reviewers; how reviewers are deployed to validate data; and how Sieve discovers and fixes human input errors. *Id.* ¶ 36. The Review Process is kept a strictly

2

guarded secret at Sieve, as it is a critical part of Sieve's ability to ensure the data it gives to customers is delivered efficiently and accurately. *Id.* ¶ 32.

Taken together, the Workflow, the Source Code, and the Review Process are Sieve's most confidential trade secrets and drive the economic value of the business. *Id*.

*Tynan Joins Sieve as its CTO*

The Company had a prototype product by the time it was incorporated in January 2025, and soon thereafter, applied to (and was later accepted to) the prestigious startup accelerator Y Combinator. *Id.* ¶ 12. In February 2025, Lu met Defendant Savannah Tynan. Tynan was also an MIT-trained computer scientist and had worked for Bain & Company, meaning that she had experience with the large, unstructured data sets that Sieve would process. *Id.* ¶ 13, 15.

Tynan joined Sieve and was appointed to its board in March 2025. *Id.* ¶ 14. At the time, Lu and Tynan were Sieve's primary personnel: Lu was Chief Executive Officer, and Tynan was Chief Technology Officer. *Id.* ¶ 1, 16. As CTO, Tynan was given access to all of Sieve's confidential information and trade secrets, including its business plans, vendor and client contracts, pricing model, sales leads, source code, model evaluations, Workflow procedures, human reviewer hiring and training materials, and other competitively sensitive information. *Id.* ¶ 20. She was entrusted with the job of implementing Sieve's information security controls and protocols, while also playing a role in coding and product development. *Id.* ¶ 16.

Even though Lu and Tynan were excited to build Sieve together, an incident early in their working relationship gave Lu pause about Tynan's business practices. In April 2025, Tynan tried to convince an employee of one of Sieve's competitors to mine that company's customer-relationship management system for potential customers, resign, and then provide that information to Sieve. *Id.* ¶ 51. Lu strongly objected to this plan, but Tynan did not relent until Sieve's Y

3

Combinator mentor stepped in, telling Tynan directly: "Do not have her search through her current company database to give you leads[.] Highly illegal and unethical[.]" *Id.*

This incident presaged things to come.

*Sieve Implements Strict Information Security Protocols*

As an early-stage startup, Sieve was well aware it needed to protect its trade secrets and other confidential information. It did so in three key ways.

First, Sieve stored its source code on a private GitHub server. It stored the rest of its sensitive data on an enterprise-level Google Workspace system, which included Company Gmail and Calendar accounts, as well as secure Google Drive storage for its business plans, vendor and client contracts, pricing model, sales leads, workflow procedures, client data, reviewer hiring and training materials, and other commercially sensitive information. *Id.* ¶ 29, 31. Both the GitHub and Google Workspace systems were (and are) password-protected and require an authorized Sieve account to access. *Id.* ¶ 29 Each Sieve account, in turn, is protected via two-factor authentication (meaning a password and some other form of identity verification) to ensure that only authorized Sieve users can log into it. *Id.* Further, all Sieve accounts are connected to the central employee management platform in the Company's Google Workspace. *Id.* Lu and Tynan, as Sieve's executives and board members, were thus able to control who received access to Sieve's confidential information, define how much access each person had, and monitor their usage of and access to that information. Only they had full access to Sieve's data; other employees and contractors were given limited access on a need-to-know basis. *Id.* ¶ 41.

Second, Sieve made its personnel sign strict confidentiality agreements. This was particularly important in Tynan's case, since her role as CTO gave her access to virtually all of Sieve's most sensitive information. On April 4, 2025, Tynan signed a Confidential Invention

4

Assignment Agreement (the "Agreement"), a copy of which is attached as Exhibit A to the Lu Declaration. The Agreement defined "Confidential Information" as any "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties", including:

- "technical data, trade secrets, . . . product or service ideas or plans, software codes and designs",
- "agreements with third parties, lists of, or information relating to, employees and consultants of the Company…or suppliers and [prospective and actual] customers", and
- "price lists, pricing methodologies, cost data, market share data, marketing plans…contract information, business plans…budgets or other business information".

Agreement, at §2(b).

Pursuant the Agreement, Tynan agreed "at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform [her] obligations to the Company . . .and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that [she] obtain[s], access[es] or create[s]" in connection with her work for Sieve. *Id.* § 2(a). If Tynan were to leave the Company, the Agreement obligated her to "deliver to the Company (and [not] keep in [her] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns." *Id.* § 4. She would also then be required to deliver a certification to the Company confirming that she had returned all such data and would continue to abide by the

5

Agreement. *Id.* § 5, Ex. C thereto. Lu had signed a virtually identical agreement, and Sieve required all of its contractors to sign similar non-disclosure agreements. Lu Decl. ¶ 24.

Third, Tynan began to draft and implement Company-wide security policies that would help it earn "System and Organization Controls 2", or "SOC2", Types I and II certifications, thereby ensuring that Sieve's data security and privacy controls were consistent with industry best practices. *Id.* ¶ 26.[1] In connection therewith, Tynan drafted the Company's initial Code of Conduct in June 2025, which barred Sieve's employees and contractors from transferring or saving Company data, documents, work, or other information to personal devices, or revealing details of the Company's clients and business operations to outside entities without approval. *Id.*

*Tynan Leaves Sieve and Steals All of its Data*

Tynan lasted only four months at Sieve. She stopped doing any substantive work for the Company in mid-June 2025, and agreed to part ways with Lu and Sieve in early July. *Id.* ¶ 45. At the time, Tynan expressed to Lu and their Y Combinator mentor that she wanted to be a founder and intended to raise another venture in the future. *Id.* On July 12, 2025, Lu emailed Tynan with proposed terms of separation, and soon thereafter confirmed that Tynan's last day would be July 18th. On the 18th, Lu terminated Tynan's access to all Sieve systems. *Id.* ¶ 49.

Problems arose almost immediately. The same day she was terminated, Tynan, through prior counsel, demanded back pay for her work at the Company (even though she had drawn a salary for most of her time at Sieve). *Id.* ¶ 50. Sieve likewise demanded, as per the Agreement, that Tynan return all of her Company property, including any Confidential Information and

---

[1] Tynan departed Sieve before she was able to secure these certifications. Lu later obtained them herself, and implemented additional security controls at the Company. Lu Decl. ¶ 28.

computer login access codes in her possession, and certify that she possessed no other such information. *Id*. Tynan refused. *Id*. Her counsel wrote on August 17, 2025 that Tynan "does not have any interest or desire to maintain Sieve Data confidential information"—conceding that she in fact possessed the Company's data—"but cannot lawfully delete any such materials at this time given that litigation between the parties is reasonably likely and both sides have a duty to preserve evidence." *Id*. ¶ 64; Ex. D.

*Sieve's Audit Reveals the True Scope of Tynan's Wrongdoing*

This concession caused Lu to believe that Tynan had engaged in serious wrongdoing. Recalling Tynan's earlier attempt to steal a competitor's customer lists, Lu caused Sieve's counsel to hire BlueStar, a third-party forensic consultant, to audit Tynan's use of Sieve's technology in the days before her July 18th departure. A copy of Google Takeout log from BlueStar's October 2025 audit (the "Audit") is attached as Exhibit B to the Lu Declaration; BlueStar separately generated logs of Tynan's Google Sync and Google Drive activity as part of the Audit.

The results of the Audit were shocking. It revealed that on July 14th, after Lu had emailed Tynan the proposed terms of her separation from the Company, Tynan initiated multiple "Google Takeout"[2] requests that allowed her to download ***the entirety of Sieve's Google Drive, Gmail, and Calendar files.*** *Id.* ¶ 52. On July 17th, the day after Lu told Tynan that her last day would be July

---

[2] Google Takeout is a bulk data transfer service that allows a user to copy some or all of the files contained in a Google "cloud" to which they have access, package those copied files into a readily transferrable archive, and download that archive onto another device. It was not used in the normal course of Sieve's business. Lu Decl. ¶ 53.

18th, Tynan downloaded these "Takeout" records, via a Brooklyn-based IP previously associated with her apartment.[3]

The Audit further revealed that throughout July, including on July 17th and 18th (weeks after she had stopped work and days after being told her departure date), Tynan had "synced" her laptop and several personal devices to Sieve's systems, ensuring that she had the most up-to-date versions of Sieve's files stored on several different places. As a result of the Takeouts and her efforts "sync" to Sieve's systems, Tynan had ***all of Sieve's data, including its most sensitive trade secrets and confidential information***: its pricing models, its product/model evaluations, customer and sales leads, notes from sales calls, its customer outreach tracker, and all data related to the Review Process. *Id.* ¶ 59. This is the precise kind of data that Sieve had iterated and worked on for months to secure an edge in the market, and which would allow a competitor to replicate Sieve's work. *Id.* ¶ 60.

If this were not enough, on July 20th—two days after her departure and after her access to Sieve's Google Workspace was revoked—Tynan was able to sync a copy of Sieve's highly confidential reviewer assessment document to her personal email account. She had apparently set this up in advance by sharing the document with herself while she still had full CTO-level access to Sieve's systems. *Id.* ¶ 61.

Finally, Tynan has refused to certify that she deleted the copy of Sieve's Source Code that she maintained on her laptop. *Id.* ¶ 62.

---

[3] An IP address is a unique numerical identifier assigned to each device connected to the internet.

8

*Sieve Attempts a Resolution, But Tynan Rejects It*

Upon receiving the results of the Audit, Sieve, through prior counsel, once again demanded that Tynan return all stolen data and submit to a forensic analysis of her personal electronic devices to ensure that she had not kept secret copies of Sieve's data. *Id.* ¶ 64. She refused, with her counsel again invoking the duty to preserve evidence in anticipation of litigation, but offered on October 16th to work towards a protocol that "results in a deletion of any company confidential information in her possession" and to have her "sign a certification." Ex. D, at pg. 4-5.

The parties spent the next two months attempting to negotiate a protocol, to no avail. On December 4, 2026, Tynan's counsel rejected Sieve's then-most recent proposal, but still suggested that there was room to reach a deal. *Id.*

In a last-ditch effort to resolve this dispute, Sieve sent a final demand letter to Tynan on February 22, 2026, demanding substantially the same relief as it seeks here. *Id.* ¶ 66, Ex. E. Tynan did not respond in any way. This application promptly followed.

## **ARGUMENT**

Courts in this District regularly order emergency and preliminary relief in cases such as this to remedy the misappropriation of trade secrets and other sensitive confidential information. *See, e.g., PleasrDAO v. Shkreli*, 804 F.Supp.3d 362 (E.D.N.Y. 2025); *DermSource, Inc. v. CityMedrix, LLC, et al.*, 2023 WL 265905 (E.D.N.Y. Jan. 18, 2023); *IME Watchdog, Inc. v. Gelardi, et al.*, 2022 WL 1525486 (E.D.N.Y. May 13, 2022). To obtain a preliminary injunction safeguarding its information and preserving the status quo, Sieve must show: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships

9

tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *See Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022) (citation omitted).

Likewise, with respect to the "mandatory" portion of Sieve's requested injunction that would modify the status quo (*i.e.*, returning information and forensically certifying deletion), Sieve must also "make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." *See A.H. by and through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

Sieve readily meets both standards. The Court should issue the requested injunction.

## I.    Sieve Would Suffer Irreparable Harm Absent a Preliminary Injunction.

Irreparable harm "is the *sine qua non* for preliminary injunctive relief" and "the single most important prerequisite for the issuance of a preliminary injunction[.]" *Intertek Testing Svcs., N.A., Inc. v. Pennisi*, 443 F.Supp.3d 303, 328 (E.D.N.Y. 2020) (internal citations omitted). To establish irreparable harm, a moving party must show a harm that is "actual and imminent," and that "cannot be adequately [ad]dressed by final relief on the merits and for which money damages cannot provide adequate compensation." *IME Watchdog, Inc*, 2022 WL 1525486 at *6; *Allstate Ins. Co. v. Elzanaty*, 929 F.Supp.2d 199, 221 (E.D.N.Y. 2013) (internal quotations and citation omitted).

Courts in this Circuit recognize that theft of trade secrets, particularly where a defendant retains access to them and may disseminate them, constitutes irreparable harm. *See Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets."); *see also IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a

10

presumption of irreparable harm"); *DeWitt Stern Grp. Inc. v. Eisenberg*, 2013 WL 2420835, at *4 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results . . . 'where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences'").

Those concerns are present here in the starkest possible form. Tynan did not merely copy isolated documents. Instead, after learning that her tenure with Sieve was at an end, she abused her role as CTO—and the access it granted—to execute multiple Google Takeout downloads of the entirety of Sieve's Google Workspace environment**,** thereby copying the Company's internal emails, documents, calendars, and other records to her personal devices. Lu Decl. ¶ 52. This included pricing models, the Workflow, the Review Protocol, the Source Code, customer lists, customer feedback reports, and review evaluations. Lu Decl. ¶ 30-31, 52, 54. This is precisely the kind of information courts have recognized as capable of causing irreparable harm if misused. *See Devos, Ltd. v. Record*, 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (imposing preliminary injunction where former employees abused their "virtually unlimited access" to company files to misappropriate the same kinds of information at issue here).

Further, Tynan conceded in the Agreement that any breach of its confidentiality obligations—which she unquestionably violated here—"may cause the Company irreparable harm," and "agree[d]" that the Company will be able to seek extraordinary relief in court, including, but not limited to . . . preliminary injunctions and permanent injunctions . . . without the necessity of posting a bond or other security." Agreement ¶ 11(f).

Finally, the risk of harm is "actual and imminent" in light of Tynan's decision to end negotiations over a protocol to secure Sieve's data. Sieve worked with Tynan in good faith for a period of months, relying on Tynan's counsel's representations that she did "not have any interest

11

or desire to maintain Sieve Data confidential information," and that she was at least theoretically willing to sign a certification. Lu Decl. ¶ 64, Ex. D. But by refusing to even acknowledge Sieve's February 22nd demand letter, Tynan has made clear that circumstances have changed. Given Tynan's stated desire to become a founder again, her prior willingness to use misappropriated data, Lu Decl. ¶ 45, and her professional background, her abandonment of settlement talks three weeks ago is strong evidence that irreparable harm is imminent. *See Marks Org., Inc. v. Joles*, 784 F.Supp.2d 322, 333 (S.D.N.Y. 2011) ("diligent pursuit of settlement negotiations can justify delay"); *199 Delaware Ave., Inc. v. Lake Effect Artisan Ice Cream*, 2019 WL 1723588, at *4 (W.D.N.Y. Apr. 18, 2019) (noting that "unjustified" delays of "more than two months" weigh against preliminary injunctions); *Nature's Bounty, Inc. v. SuperX Drugs Corp.*, 490 F.Supp. 50, 56 (E.D.N.Y. 1980) (finding four month delay after the breakdown of settlement discussions "not a bar to injunctive relief").

Thus, Sieve readily satisfies the irreparable harm requirement for preliminary relief.

## II.    Sieve Is Likely to Succeed on the Merits.

In this Circuit, showing that a plaintiff is likely to succeed on the merits of a claim does not require "absolute certainty"—merely that "the probability of his prevailing is better than fifty percent." *HomeIt, Inc. v. Wen*, 2020 WL 353098, at *5 (E.D.N.Y. Jan. 21, 2020) (*quoting Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Further, when a plaintiff (like Sieve) seeks preliminary relief on multiple grounds, it need only establish a likelihood of success on the merits on one of them to obtain an injunction. *See 725 Eatery Corp. v. City of N.Y.*, 408 F.Supp.3d 424, 459 (S.D.N.Y. 2019). Here, Sieve is likely to prevail on each and every one of its claims.

### A.    Tynan Violated the DTSA

Tynan violated the DTSA by misappropriating all of Sieve's trade secrets. The DTSA provides a "private right of action for an owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F.Supp.3d 328, 383-84 (S.D.N.Y. 2023) (cleaned up); *see* 18 U.S.C. § 1836(b)(1). To prevail on a DTSA claim, a plaintiff must simply show that "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Id.* at 384 (citation omitted). Both elements are satisfied here.

*Sieve's Confidential Information Constitutes Trade Secrets*

The DTSA defines "trade secret" to cover "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized" so long as:

> (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

Sieve's Workflow, Review Process, and Source Code are all trade secrets because they "derive independent value" from not being known to the general public. Were competitors to know, for example, how Sieve's AI Platform can ingest and synthesize unstructured data into a customer-ready format, or how Sieve sources its human reviewers, trains them, and validates their work, Sieve's competitive advantage would evaporate. Lu Decl. ¶ 32. Likewise, Sieve's model evaluations, pricing models, customer feedback reports, customer lists, and reviewer hiring and

training materials were among the information stolen by Tynan via Google Takeout and secretly "syncing" her devices to Sieve's systems. *Id.* ¶ 57. This Circuit recognizes such information as trade secrets. *See Rokt Corp. v. AdsPostX, Inc.*, 2025 WL 2711190, at *9 (S.D.N.Y. Sept. 23, 2025) (*quoting In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law")).

Next, given the sensitivity of this information, Sieve took "reasonable measures" to ensure it was kept secret. While the DTSA gives "scant guidance" on what makes a measure reasonable, courts in this Circuit "look to contractual confidentiality agreements or physical security measures," such as "password-protection, sharing information with employees only on a need-to-know basis," and "emphasizing the need to keep information confidential in an employee handbook." *See Rodney v. United Masters*, 2023 WL 2184865, at *5 (E.D.N.Y. Feb 10, 2023). This is precisely what Sieve did: its confidential data was stored on a private GitHub repository or on Google Workspace (all of which required two-factor authentication); Tynan and Lu were both required to sign strict confidentiality agreements; and employees and contractors were similarly held to confidentiality agreements and given information only on a need-to-know basis. Lu Decl. ¶ 41. Tynan herself was tasked with implementing security policies in line with industry best practices, and she and Lu were the only Sieve personnel (given their roles) who had access to all of the Company's data. *Id. See Rokt*, 2025 WL 2711190, at *9 (finding the use of confidentiality agreements and electronically limiting access to documents to be reasonable security measures). Sieve's security measures were therefore reasonable, and the information stolen by Tynan qualifies as "trade secrets."

14

*Tynan Misappropriated Trade Secrets*

"Misappropriation" is also broadly defined by the DTSA. It covers both the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," as well as "disclosure or use of a trade secret of another" without consent by someone who, among other things, "knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5). Critically, the DTSA then defines "improper means" to include both "theft" and "breach . . . of a duty to maintain secrecy." *Id.* § 1839(6).

Tynan's actions could be nothing but misappropriation. She was bound under the Agreement to hold in the "strictest confidence" exactly the kind of data she downloaded via Google Takeout and synced to her devices: "technical data, trade secrets, . . . product or service ideas or plans, software codes and designs," "agreements with third parties, lists of, or information relating to, employees and consultants of the Company…or suppliers and [prospective and actual] customers", "price lists, pricing methodologies, cost data, market share data, marketing plans…contract information, business plans," and "budgets or other business information." Agreement §§ 2(a)-(b). She acquired this information in secret, just after learning her time with Sieve was coming to an end and just before her computer access was shut off. Lu Decl. ¶ 52, 54. There was also no justification for this—none of the information she took was relevant to any potential compensation claims she might have (and has never filed) against the Company.

Sieve is therefore highly likely to succeed on the merits of its DFTA claim.

## B.      Tynan Breached the Agreement

Sieve is highly likely to succeed on its claim that Tynan breached the Agreement.[4] As set forth above, Tynan signed the Agreement on April 4, 2025. By doing so, she agreed that when she left the Company, she would safeguard the confidentiality of the Company's confidential information and not use it for any purpose other than Company business. Agreement § 2. She further agreed that, when she left Sieve, she would "deliver to the Company (and [not] keep in [her] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence," and any other data belonging to the Company. *Id.* § 4.

Tynan did neither. Without authorization, just before leaving the Company, she exploited her CTO-level access to Company systems to initiate and download a Google Takeout of ***all*** of the Company's confidential information, including its Workflow and Review Process. She synced her devices to the Company's systems to make sure she had the most up-to-date versions of Sieve's files, even going as far as to target some of Sieve's most critical documents to ensure she had those materials, and attempted to again access Sieve's files after her departure. She also maintained, and refused to delete, her copy of the Source Code. Lu Decl. ¶ 50. And despite her counsel admitting that she had Company information, she refused to delete it or provide the required certification. *Id.* By any rational measure, she violated the Agreement and is liable for breach of contract.

---

[4] The Agreement is governed by California law. The elements of breach of contract under California law are the same as in New York: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

16

## C.    Tynan Violated State Law Prohibiting Misappropriation of Trade Secrets

As a resident of New York who conducted an unauthorized Google Takeout (among other things) of Sieve's files from her home in Brooklyn, Tynan is liable for misappropriation under New York State law. And since the Agreement provides that "the rights and obligations of the parties hereto shall be governed, construed, and interpreted in accordance with the laws of the State of California," without regard to conflicts of laws principles, Agreement § 11(a), Tynan is also liable for violating California's Uniform Trade Secrets Act ("CUTSA"). *See* Cal. Civ. Code §§ 3426 *et seq.*

The elements of a misappropriation claim under New York law and a CUTSA claim are identical to the elements of a DTSA claim. *See PleasrDAO*, 804 F.Supp.3d at 376 (E.D.N.Y. 2025) ("The elements required to establish misappropriation of trade secrets under the DTSA and New York law are fundamentally the same.")[5]; *Alta Devices, Inc. v. LG Electronics, Inc.*, 343 F.Supp.3d 868, 877 (N.D. Cal. 2018) ("The elements of [a] misappropriation [claim] under the DTSA are similar to those under the CUTSA" except for a limitation on when claims arise not applicable here (citation omitted)).[6] Therefore, since Tynan violated the DTSA by stealing Sieve's

---

[5] "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate, first, that it possessed a trade secret, and second, that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *PleasrDAO*, 804 F.Supp.3d at 376 (E.D.N.Y. 2025).

[6] "To state a claim for trade secret misappropriation under the DTSA and the CUTSA, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Space Data Corp. v. X*, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017) (citation omitted).

confidential information and trade secrets, *see* Section II(A) *supra*, she likewise violated both New York law and the CUTSA.

Sieve is therefore likely to succeed on the merits of its state law misappropriation claims.

## III. A Preliminary Injunction is in the Public Interest

An injunction barring Tynan from misusing or disseminating Sieve's confidential information is in the public interest. "[T]here is a substantial public interest in the protection of trade secrets and proprietary information as well as the enforceability of contracts." *BaseCap Analytics Inc. v. Amenn*, 2023 WL 8113524, at *4 (S.D.N.Y. Nov. 22, 2023) (citations omitted). Should the Court decline to issue an injunction, it would send a message that the trade secrets of early-stage startups and mature companies alike are fair game for dissatisfied co-founders or senior executives. This would have a chilling effect on innovation and development, which runs contrary to public policy. *See IME Watchdog, Inc.*, 2022 WL 1525486 at *8 ("It goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest.").

Therefore, an injunction against Tynan is in the public interest.

## IV. The Court Should Waive Any Obligation to Post a Bond

While FRCP 65(c) normally requires the party seeking a preliminary injunction to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," it need not do so here. The Agreement provides that if Tynan breaches its terms, as she did here, "the Company will be able to seek extraordinary relief in court, including, but not limited to . . . preliminary injunctions and permanent injunctions . . . without the necessity of posting a bond or other security." Agreement ¶ 11(f). Courts also disregard the bond requirement where, as here, a plaintiff "is highly likely to

prevail on the merits . . . and the hardship to Defendants, if any, thus would be minimal." *IME Watchdog*, 2022 WL 1525486, at *8. The Court should therefore preliminarily enjoin Tynan without requiring Sieve to post a bond.

## **CONCLUSION**

For the reasons set forth above, the Court should issue a preliminary injunction (i) compelling Tynan to return and delete the information she stole from the Company; (ii) enjoining further retention or distribution of the stolen information; and (iii) requiring a forensic analysis, at Tynan's expense, of her personal electronic devices to confirm whether she has provided the stolen information to anyone else or improperly retained copies of the information.

DATED:        March 13, 2026
              New York, NY

Respectfully submitted:

___*/s/ Joseph Gallagher*____
Jonathan Harris
Joseph Gallagher
Marilyn Yuan
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
T: (212) 397-3370
E: jon@hs-law.com
E: jgallagher@hs-law.com
E: myuan@hs-law.com

*Attorneys for Plaintiff Sieve Data Inc.*

19

## <u>WORD COUNT CERTIFICATION</u>

I, Joseph Gallagher, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word count limit set forth in Local Rule 7.1(c) of this Court because it contains 6,300 words. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

    Dated:       New York, New York
                  March 13, 2026

                                      */s/ Joseph Gallagher*
                                   JOSEPH GALLAGHER